**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **JANELLA TURNER**, *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-0048 (RMC)** |
| | ) | |
| **DISTRICT OF COLUMBIA**, *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Janella Turner holds the District of Columbia responsible for the violent death of her son, Eric Nathaniel Nelson, Jr., who was shot and killed by James Devon Hill after Mr. Hill absconded from a group home for juvenile offenders operated on behalf of the D.C. Youth Services Administration ("YSA"). The complaint alleges violations of Mr. Nelson's constitutional rights and negligence injuring Mr. Nelson and Ms. Turner, all allegedly committed by the District of Columbia and Gayle Turner, the YSA Administrator. Defendants move for judgment on the pleadings or, in the alternative, for summary judgment. Ms. Turner opposes the motion.

## I. BACKGROUND

The factual background to this case is taken from Ms. Turner's complaint, which is assumed to be true for purposes of the motion for judgment. *See Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002). Mr. Nelson was shot and killed by Mr. Hill on August 22, 2001, in the 1300 block of Neal Street and Trinidad Avenue N.E., Washington, D.C. Compl. ¶ 17. Mr. Hill was a

ward of the District of Columbia who had escaped from a group home operated on behalf of the YSA approximately three days earlier. *Id.* ¶ 18. Defendants were allegedly aware that Mr. Hill had absconded from the group home on three prior occasions. *Id.* ¶ 19. Ms. Turner was not informed by Defendants that Mr. Hill had absconded from a group home. *Id.* ¶ 22. She learned this fact from a journalist with the *Washington Post*, who wrote an October 24, 2003, story entitled "D.C. Sued in Killing by Group Home Runaway," which concerned a different murder that was allegedly committed by Mr. Hill. *Id.* ¶ 23.

Ms. Turner relies on reporting from the *Post*. According to the article, during a ten month period in 2001, juveniles ran away from group homes in the District of Columbia 782 times, with more than one-third never returning. *Id.* ¶ 24. Many of these absconded juveniles committed serious crimes while they were supposed to be in Defendants' care. *Id.* ¶ 25. As of June 2002, there were allegedly more juvenile offenders loose on the streets than there were living in group homes or jail. *Id.* ¶ 26. In 2001, only two officers of the Metropolitan Police Department ("MPD") were assigned to locate absconders, who usually numbered at least 600 per year. *Id.* ¶ 27.

Based on these facts, Ms. Turner claims a "Deprivation of Civil Rights; U.S. Const. amend. IV and XIV; 42 U.S.C. § 1983" (Count I);[1] "Survival Action - Negligence" (Count II); "Wrongful Death – Negligence" (Count III); and "Negligent Hiring and Negligent Supervision" (Count IV). While the operators of the group home, Dytrad Management Services, Inc. ("Dytrad"), doing business as Gateway IV, and Associates for Renewal of Education, Inc. ("ARE"), were

---

[1] The Fourteenth Amendment of the United States Constitution expands the protections of the Fifth Amendment to the States. Because the District is not a State, however, the Fourteenth Amendment does not apply here. However, the due process and equal protection doctrines arising out of the Fourteenth Amendment are equally applicable to the District under the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

initially named as co-defendants, they have been dismissed by Ms. Turner.[2]   Count I alleges that the

District had a duty "to properly supervise a convicted criminal who was know[n] to flee from group

homes," and that it failed to protect Mr. Nelson in violation of his due process "interests in life and

property" under the Constitution.  *Id.* ¶¶ 29-30.  Counts II through IV are based on allegations that

the District:

> (i) fail[ed] to adequately supervise the Youth Services Administration . . . ;
> (ii) fail[ed] to adequately supervise a juvenile criminal know[n] for escaping
> group homes; and (iii) fail[ed] to return an escaped juvenile back to custody
> in sixty days.

*Id.* ¶ 38.  Ms. Turner also alleges that the District negligently failed to properly train its employees

to supervise juvenile offenders and regulate youth homes, which led to the negligent conduct.  *Id.*

¶¶ 54-56.  Additionally, she asserts that the District negligently assigned only two police officers to

locate approximately 600 runaways per year.  *Id.* ¶ 27.

Ms. Turner sent a letter to Mayor Anthony Williams on October 31, 2003, notifying

him of these events pursuant to the pre-suit requirements of D.C. Code § 12-309.  The lawsuit was

filed in the Superior Court for the District of Columbia on November 24, 2003 and was removed to

this court on January 13, 2004.

## II.  LEGAL STANDARDS

### A.  Subject Matter Jurisdiction

Pursuant to 28 U.S.C. § 1331(a), the "district courts shall have original jurisdiction

of all civil actions arising under the Constitution, laws, or treaties of the United States."  For

---

[2]   The District of Columbia filed a cross-claim against Dytrad and ARE, and has moved
the Court to reconsider its order dismissing Dytrad completely [Dkt. No.  65].  The Court will
grant this motion, which is opposed by Dytrad, and then dismiss all claims.

purposes of this statute, a claim "arises under" federal law in "those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983); *Quarles v. Colorado Sec. Agency, Inc.,* 843 F.2d 557, 558 (D.C. Cir. 1988).  Ms. Turner's complaint alleges that Defendants failed to protect Mr. Nelson in violation of his due process "interests in life and property" under the Fifth Amendment of the Constitution.  Compl. ¶ 29-30.  "Because this claim arises under the laws of the United States and is neither 'immaterial and made sole for the purpose of obtaining jurisdiction' nor 'wholly insubstantial and frivolous,'" this court has federal question jurisdiction under § 1331.  *E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d  621, 623 (D.C. Cir. 1997) (citing *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)).

### B.  Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time frame as not to dely the trial, any party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings will be granted if the movant shows, at the close of the pleadings, that no issue of material fact remains to be resolved, and that he or she is entitled to judgment as a matter of law.  *See Terry v. Reno*, 101 F.3d 1412, 1423 (D.C. Cir. 1996); *Haynesworth v. Miller,* 820 F.2d 1245, 1249 n. 11 (D.C. Cir. 1987); *Summers v. Howard University*, 127 F. Supp. 2d 27, 29 (D.D.C. 2000).

The standard of review for a motion pursuant to Rule 12(c) is essentially the same as that for motions to dismiss pursuant to Rule 12(b)(6).  *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 47 (D.D.C. 2005).  The  court may not rely on facts outside of the pleadings and must

"view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (citations omitted).  "The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." *Robinson*, 403 F. Supp. 2d at 47 (citing *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997) and *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n. 6 (D.C. Cir. 1993)).

Just as with a motion to dismiss under Rule 12(b)(6), granting a motion for judgment on the pleadings pursuant to Rule 12(c) is warranted only if it appears, based on the allegations set forth in the complaint, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *accord Robinson*, 403 F. Supp. 2d at 47.  Although the court must construe the complaint in the light most favorable to the non-moving party, it "need not accept inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994)*.*  In addition, the court need not accept the plaintiff's legal conclusions as true.  *Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 337 (D.D.C. 1999).

## III.  ANALYSIS

### A.  Plaintiff's Constitutional Claims

Count I of Ms. Turner's complaint alleges that Defendants violated Mr. Nelson's due process "interests in life and property" under the Fifth Amendment and thereby violated his

constitutional civil rights.[3]  Relying on the substantive component of the Due Process Clause, Ms.

Turner asserts that Mr. Nelson had a right to life, "which is clearly encompassed in the protected

right of liberty within [the] Fifth Amendment."  Plaintiff's Memorandum of Points and Authorities

in Support of Plaintiff's Opposition to Defendants District of Columbia and Gayle Turner's Motion

for Judgment on the Pleadings or, in the Alternative, for Summary Judgment ("Pl.'s Opp."), Ex. 1

at 8.[4]  She also asserts that Mr. Nelson had "a constitutionally-protected property interest in the

supervision of group home residents . . . and the retrieval of absconders from group homes."  *Id*., Ex.

1 at 5.

Defendants argue that the substantive due process argument must fail because

constitutional liability cannot be imposed solely based upon the District of Columbia's "failure to

act."  *See* Memorandum of Points and Authorities in Support of Defendants District of Columbia

and Gayle Turner's Motion for Judgment on the Pleadings or, in the Alternative, for Summary

Judgment ("Defs.' Mem.") at 10.   Defendants also contend that because Ms. Turner cannot

demonstrate that her son had a "legitimate claim of entitlement" to the proper administration of the

juvenile justice system, he did not have a constitutionally-protected property interest in that

administration.  *See* Defendants District of Columbia and Gayle Turner's Reply to Plaintiff's

---

[3] By way of 42 U.S.C. § 1983, "Congress has created a federal cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'"  *Town of Castle Rock v. Gonzales*, 125 S. Ct. 2796, 2802-03 (2005) (citing 42 U.S.C. § 1983).

[4] Ms. Turner's counsel has filed an identical motion in more than one case and submits, as Exhibit 1 to her Opposition in this case, the same opposition brief that was submitted in *Barnes v. District of Columbia*, Civil Action No. 03-2547 (RJR), "[i]n an effort to avoid redundant and impertinent argument."  Pl.'s Opp. at 1.

Opposition to Defendants' Motion for Judgment on the Pleadings ("Defs.' Reply") at 2,10.  The Court agrees.

### 1.  Due Process Rights to Liberty

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law . . . ."  U.S. CONST. amend. V.  The Supreme Court has repeatedly held that the Due Process Clause includes a substantive component, which encompasses the right of individuals to be protected from arbitrary government action.  *County of Sacramento v. Lewis,* 523 U.S. 833, 845 (1998); *see Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) ("The Due Process Clause . . . was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression.") (internal quotations and citations omitted).   However, "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 197 (1987); *see Butera v. District of Columbia*, 255 F.2d 637, 647 (D.C. Cir. 2001).

Defendants do not dispute that Mr. Nelson had a liberty interest in his own life.  *See* Defs.' Reply at 8.  However, they contend that Ms. Turner's argument that "by negligently failing to prevent the criminal act of a third party, the District has violated this liberty interest" is wholly without merit.  *Id.*

It is well-established that there is no general affirmative right under the Due Process Clause to government aid, even to protect a life.  *See DeShaney,* 489 U.S. at 195 ("[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."); *Collins*, 503 U.S. at 126 (noting that "[n]either

-7-

the text or history of the Due Process Clause" supports a claim that the government has an affirmative duty to provide its employees with a safe working environment); *Harris v. McRae*, 448 U.S. 297, 317-18 (1980) ("Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference . . ., it does not confer an entitlement to such [government aid] as may be necessary to realize all the advantages of that freedom.").

In *DeShaney*, the mother of a child who had been physically abused by his father brought a civil rights action against state social workers and local officials who were aware of the abuse, yet failed to remove the child from his father's custody. 489 U.S. at 204. Although the Court acknowledged that the facts of the case were "undeniably tragic," *id.* at 193, it noted that the "purpose" of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196. Accordingly, the Court concluded that there was no violation of the mother's substantive due process rights. *Id.* at 202.

Despite this outcome, the *DeShaney* Court did acknowledge that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. Two such circumstances were insinuated by the Court in *Deshaney* and have been subsequently recognized by the circuit courts. First, the Court noted that an affirmative duty of care and protection may arise when the State "takes a person into its custody and holds him there against his will," *id.* at 199-200, such as in the context of state incarceration or institutionalization. *See Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976). The other circumstance that the *DeShaney* Court intimated may give rise to constitutional liability is "where the state creates a dangerous situation or renders citizens more vulnerable to danger." *Butera*, 235 F. 3d at 648 (quoting *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993)); *see DeShaney*, 489 U.S. at 201.

This "exception" to the rule that States are generally under no constitutional obligation to assure minimal levels of security and safety to their citizens has been deemed the "State Endangerment" theory and was adopted by the D.C. Circuit Court of Appeals in *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2000).  *See Briscoe v. Potter*, 355 F. Supp. 2d 30, 38-39 (D.D.C. 2004), *aff'd on other grounds,* No. 04-5447, 2005 U.S. App. LEXIS 24040 (D.C. Cir. Nov. 7, 2005).[5]  This is the theory on which Ms. Turner relies to support the constitutional claim for her son.  Pl.'s Opp., Ex. 1 at 9.

*Butera* involved the death of an informant for the District of Columbia Metropolitan Police Department during an undercover drug "buy."  After advising the police that some murder suspects were selling drugs at a certain house, Mr. Butera, the informant, approached the house from the backyard to buy drugs.  He never made it into the house because he was accosted and stomped to death by three men in the backyard.  According to the police plan, Mr. Butera was to have exited the front door of the house within fifteen minutes.  Although the police observing the front of the house were anxious when he failed to appear, no one searched the backyard or kept it under surveillance.  His body was discovered forty (40) minutes later.  *Butera*, 235 F.3d at 643.

After reviewing these facts, the D.C. Circuit concluded that "an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately

---

[5] Every circuit court has now recognized the state endangerment theory as an exception to the *DeShaney* rule.  *See Benzman v. Whitman*, No. 04-1888, 2006 WL 250527, at *15 (S.D.N.Y. Feb. 6, 2006) (collecting cases).

results in the individual's harm." *Id.* at 651.[6]  In adopting this theory of government liability, the

court emphasized that the government conduct at issue must be "so egregious, so outrageous, that

it may fairly be said to shock the contemporary conscience." *Id.*; *see Briscoe*, 355 F. Supp. 2d at 40.

"This stringent requirement exists to differentiate substantive due process, which is intended only

to protect against arbitrary government action, from local tort law." *Butera*, 235 F.3d at 651; *see

also County of Sacramento v. Lewis*, 523 U.S. at 845-46 ("The touchstone of due process is

protection of the individual against arbitrary action of government. . . . Only the most egregious

official conduct can be said to be arbitrary in the constitutional sense.") (citations omitted).

Thus, in light of *Butera*, whether Defendants can be held liable under the theory of

state endangerment requires a two-part analysis: (1) whether there has been an affirmative act by the

District of Columbia to create or increase a danger that resulted in harm to the plaintiff and, if so,

(2) whether that act shocks the conscience. *See Butera*, 235 F.3d at 651; *Briscoe,* 355 F. Supp. 2d

at 40-41; *Fraternal Order of Police/Dept. of Corrections Labor Committee v. Williams*, 263 F. Supp.

2d 45, 47 (D.D.C. 2003), *aff'd*, 375 F.3d 1141 (D.C. Cir. 2004).  *Butera* emphasized the need for

*affirmative* conduct by the District:

> Regardless of the conduct at issue . . ., a key requirement for constitutional
> liability is affirmative conduct by the State to *increase* or *create* the danger
> that results in harm to the individual.  No constitutional liability exists
> where the State actors "had no hand in creating a danger but [simply] stood
> by and did nothing when suspicious circumstances dictated a more active
> role for them."

---

[6]  Because the theory of state endangerment had not previously been recognized in
this circuit, the court ultimately dismissed the complaint on qualified immunity grounds
because the officers could not have known that their actions might make them liable for a
violation of Mr. Butera's constitutional rights.  *Butera*, 235 F.3d at 654.

*Id.* at 650 (citation omitted) (emphasis added).

Several courts have determined that liability under the state endangerment theory should be rejected when State officials have encountered a dangerous situation and simply failed to act. *See e.g., Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993); *Hernandez v. City of Goshen*, 324 F.3d 535, 539 (7th Cir. 2003); *Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2003); *Pena v. DePrisco*, 432 F.3d 98, 108 and 110 (2d Cir. 2005). In contrast, when State officials *create* a dangerous situation or *affirmatively render* individuals more vulnerable to a dangerous situation, liability may be imposed. *See Reed*, 986 F.2d at 1127 (imposing liability where State officers "knowingly and affirmatively create a dangerous situation . . . and fail to take reasonable steps to diffuse that danger"); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993) (affirming a district court's denial of a motion to dismiss where plaintiff's complaint "went well beyond allegations that the defendant officers merely stood by and did nothing"); *see also DeShaney*, 489 U.S. at 201 (refusing to impose constitutional liability where the State was aware of certain dangers but "played no part in their creation, nor. . . [did] anything to render [the child] more vulnerable to them").

While Ms. Turner acknowledges that municipalities are generally under no constitutional obligation to assure minimal levels of security and safety to their citizens, *see* Pl.'s. Opp., Ex. 1 at 9, she relies on the state endangerment theory and the D.C. Circuit's decision in *Butera* to support her argument that Defendants violated Mr. Nelson's constitutional rights. She asserts that "Defendants in this case took an active role in the creation and aggravation of the danger, as opposed to an independent danger, within which Defendants chose not to intervene." *Id.* at 10. Specifically, Ms. Turner identifies the "dangers created or enhanced by the State" as "the failure to

supervise juvenile residents of group homes and the failure to apprehend absconders from the group homes." *Id.*

This argument "confuses the inert failure to protect with the proactive creation or exacerbation of danger." *Windle v. City of Marion*, 321 F.3d 658, 663 (7th Cir. 2003) (refusing to find city and city officials constitutionally liable for failing to protect plaintiff from ongoing molestation by her middle school teacher, despite their prior awareness of it). While Ms. Turner argues that Defendants committed an *affirmativ*e act that caused Mr. Nelson's death, she identifies no such act(s). Indeed, the complaint only alleges "failure" by the defendants to prevent Mr. Hill's abscondance and their "failure" to locate him and return him to the group home. A failure to act is not an affirmative act. *See Butera*, 235 F.3d at 650; *Pena*, 432 F.3d at 108,110; *Cartwright*, 336 F.3d at 493; *Briscoe*, 355 F. Supp. 2d at 42. Assuming the facts of Ms. Turner's complaint to be true for purposes of the motion, Defendants merely failed to take action or "stood by and did nothing" in the face of a known prospect that Mr. Hill would abscond. This failure to act simply does not amount to a constitutional violation. *See Collins v. Harker*, 503 U.S. at 126 (finding no liability for failure to warn employees about known dangers in the workplace); *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728 (7th Cir. 2005) (failure to post lower speed limit not an affirmative act that led to child's death when struck by speeding car); *see also Benzman v. Whitman*, No. 04-1888, 2006 WL 250527, at *16 (S.D.N.Y. Feb. 6, 2006) ("Merely alleging a failure to interfere when misconduct takes place, and nothing more . . . is not sufficient in pleading a constitutional violation based on the state-created danger doctrine.").

Even assuming Defendants had prior knowledge that Mr. Hill would successfully run away from the group home, there is no allegation of an *affirmative* act by the defendants that

contributed to Mr. Hill's murderous action against Mr. Nelson.  The "danger" identified in the complaint is the fact that Mr. Hill was free from governmental restraint and therefore able to commit his crime against Mr. Nelson.  The District of Columbia cannot be said to have "created" or "increased" this danger.  *See Butera*, 235 F.3d at 650.  The appropriate inquiry is not whether Mr. Nelson was placed in greater danger by the freedom of Mr. Hill after he had been taken into the District's custody; the proper question is whether the District placed Mr. Nelson in a "worse position than that in which he would have been had [the District] not acted at all."  *DeShaney*, 489 U.S. at 201.  Had the District wholly failed to act with regard to Mr. Hill, it would not have arrested or detained him in the first place.  The fact that the District, for a limited time, protected the public from Mr. Hill did not create an affirmative duty under the Fifth Amendment to continue to protect the public from him.

Ms. Turner seeks to avoid this result by arguing that Defendants were "deliberately indifferent" to the possibility that Mr. Hill might run away from the group home and commit further crimes.  She relies on *Ashford v. District of Columbia*, 309 F. Supp. 2d 8, 14 (D.D.C. 2004) to support her claim that "deliberate indifference would give rise to a § 1983 action."  Pl.'s Opp., Ex. 1 at 11.  This argument is without merit.[7]

---

[7] Ms. Turner's "deliberate indifference" argument and her reliance on *Monell v. Dep't of Social Serv. of the City of New York*, 436 U.S. 658 (1978), in support of that argument reflects some confusion.  "Deliberate indifference" is not a constitutional violation but, instead, can give rise to municipal liability for a constitutional violation.  *See Monell,* 436 U.S. at 694 (holding that a municipality cannot be held liable for a constitutional injury inflicted by its employees unless "execution of a government's policy or custom . . . inflicts the injury").  "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id.*  In this context, "deliberate indifference" to the consequences of a constitutional violation can provide the *proof* that the constitutional violation occurred as a result of a municipal policy.  Contrary to Ms. Turner's argument, *Monell* does not provide a substitute standard for proving a constitutional violation; it establishes an *additional* element of

Ashford concerned the plight of an inmate who alleged that prison guards failed to protect him from an assault by other inmates.  As noted above, the DeShaney Court recognized that when the government limits the freedom of persons by imprisoning them, it has a higher obligation for their welfare than when they are in the community at large.  DeShaney, 489 U.S. at 199-200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general wellbeing.").  Accordingly, in Ashford, this court held that although the District is not obligated to provide an assault-free environment in jail, when it acts with deliberate indifference to the safety of an inmate through policy or custom, and when it is aware that this indifference would cause an unreasonable threat of violence among inmates, there is a constitutional right to be protected.  See 306 F. Supp. 2d at 14; see also Morgan v. District of Columbia, 824 F.2d 1049, 1057 (D.C. Cir. 1987); Estelle v. Gamble, 429 U.S. 97, 103-04 (1976).  Unlike the plaintiff in Ashford, Mr. Nelson was not incarcerated or held in state custody at the time of the incident.  Nothing in Ashford can be read to impose any constitutional duty on the city to keep its citizens safe on the streets from the potential violence of youthful absconders.

Ms. Turner alleges that Mr. Hill killed Mr. Nelson.  She does not allege any affirmative act by which the District of Columbia created or increased the danger to Mr. Nelson.  The

---

proof for constitutional claims against municipalities.  In other words, without a cognizable constitutional violation, the Monell doctrine never comes into play.  See Butera, 235 F.3d at 646 (noting that the threshold issue brought in any case under § 1983 is "whether the plaintiff has alleged the deprivation of a constitutional right at all") (citations omitted); Schroeder v. City of Fort Thomas, 412 F.3d 724, 727 (6th Cir. 2005) (noting that the court need not address the municipal policy issues because plaintiff had failed to first establish the violation of federally protected right).

District, therefore, cannot be held liable under the state endangerment theory of liability.  The claim that the District violated Mr. Nelson's liberty interest will be dismissed.

### 2.  Due Process Rights to Property

The Fifth Amendment guarantees that the government will not deprive its citizens of any property without due process of law.  *See* U.S. CONST. amend. V.  "Property" in this context extends beyond real estate or physical possessions and can include rights to government benefits, such as welfare benefits, *Goldberg v. Kelly*, 397 U.S. 254 (1970), disability benefits, *Matthews v. Eldridge*, 424 U.S. 319 (1976), public education, *Goss v. Lopez*, 419 U.S. 565 (1975), utility services, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978), and, on occasion, government employment, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).  The Supreme Court has recently emphasized that "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.'"  *Town of Castle Rock v. Gonzales*, 125 S. Ct. 2796, 2803 (2005) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Such an entitlement must be created and defined "by existing rules or understandings that stem from an independent source such as state law." *Roth,* 408 U.S. at 577.  These rules or understandings must provide a person with "an objectively reasonable expectation that he is entitled to" the benefit.  *Hall v. Ford*, 856 F.2d 255, 266 (D.C. Cir. 1988).  Furthermore, "a benefit is not protected if government officials may grant it or deny it at their discretion."  *Town of Castle Rock*, 125 S. Ct. at 2803 (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462-63 (1989)).  Finally, benefits to the public at large that are not specific to an individual are not "property"

interests protected by the Due Process Clause.  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property .is an individual entitlement grounded in state law.").

      While Ms. Turner recognizes these legal principles, she argues that Mr. Nelson had a constitutionally-protected property interest in the supervision of group home residents within the juvenile justice system and the retrieval of absconders from group homes because of the 1986 Consent Decree entered in *District of Columbia v. Jerry M.*, 571 A. 2d 178 (D.C. 1990).  *See* Pl.'s Opp., Ex. 1 at 6.  An examination of the court's decision in *Jerry M.* invalidates this argument.

      Jerry M. represented a class of detained and committed children confined in secure juvenile institutions in the District of Columbia.  *Jerry M.*, 571 A.2d at 180.  After his suit to force a more flexible and meaningful juvenile justice system, the parties agreed to a Consent Decree that was "limited in scope." *Id.*  The Consent Decree "was limited to the design of placement alternatives for youth no longer requiring secure confinement . . .[The District agreed] to implement a juvenile justice system with a variety of community based services and thereby reduce the time youth were inappropriately housed in secure facilities." *Id.*  Three and one-half years after agreeing to the Consent Decree, the District of Columbia was in "pervasive noncompliance," *id.* at 179, and was held in contempt.  In reaching its contempt decision, the District of Columbia Court of Appeals noted:

> The Consent Decree was based on three general principles.  The first principle was "the right of children to be housed and provided services in the least restrictive setting consistent with the protection of the public, the youth's individual needs and with applicable court rules, statutory and constitutional provisions."  The second principle was the right of a child not to be in secure confinement when capable of functioning effectively in a community based program.  The third principle was that a child should remain in pretrial detention for the shortest possible period and in no event

> to exceed 30 days or, in the case of a pretrial shelter house placement, 45
> days . . . .

*Id.* at 181. "[T]he plan included increased use of diversion from prosecution, temporary housing for youth whose parents cannot be located, increased use of 'home detention,' short term foster care, alternatives to secure detention, creation of therapeutic group homes for committed youths, creation of programs for juvenile drug users including new treatment facilities and youth-run businesses; regular review of placements; increased involvement of community groups in providing services; and improved record keeping and monitoring of placements." *Id.* at 182.  According to Ms. Turner, the District has yet to meet fully the requirements of the 1986 Consent Decree.  *See* Pl.'s Opp., Ex. 1 at 14.  From this non-compliance and the Consent Decree's terms, she argues that "[i]t is a mandatory function of Defendants to make efforts to find and retrieve juvenile offenders who have absconded from their custody.  An officer faced with an absconded youth has no discretion to simply allow the juvenile to continue on the streets . . . ."  *Id*. at 7-8.

       To the contrary, the *Jerry M.* Consent Decree imposes no type of mandatory action that could give rise to a constitutionally-protected property interest.  First, there is nothing in the Consent Decree that mandates its enforcement by the MPD.  There is no language from the Consent Decree or prior cases to support Ms. Turner's assertion that the Consent Decree created a mandatory duty to prevent Mr. Hill's abscondence from the group home or a mandatory duty to find and arrest him promptly.  *Town of Castle Rock*, 125 S. Ct. at 2803 (noting that a discretionary benefit cannot give rise to a constitutionally-protected property interest).  Second, decisions as to whom to arrest are quintessential exercises of police discretion.  *Id*. at 2806 ("A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes.").    Third, *Jerry M.* gives

-17-

no indication that the Consent Decree was intended to, or did, give the public an affirmative entitlement to protection from the juvenile offenders it addressed; rather, it was focused entirely on the needs of juvenile offenders themselves.

Even if mandatory language were included in the *Jerry M.* Consent Decree, the Supreme Court's recent decision in *Town of Castle Rock v. Gonzales* makes it clear that the Decree still would not create a constitutional property right for individual citizens. The facts of *Town of Castle Rock* are admittedly "horrible." *Id.* at 2800. The plaintiff's husband violated a restraining order that she had obtained against him and took their three daughters from the yard of their home while they were playing outside. On several occasions throughout the course of that evening, the plaintiff asked the local police to take steps to enforce the restraining order. The police refused to act, instructing the plaintiff to wait until later in the evening to see if her husband returned with the girls. At approximately 3:20 a.m. the next morning, the plaintiff's husband arrived at the local police station and provoked a gun battle with police officers in which he was killed. The officers found the dead bodies of the plaintiff's three daughters inside of her husband's truck. *Id.* at 2801-02.

The plaintiff based her constitutional claim on the state-issued restraining order which, on its face, appeared to mandate the arrest of her husband once he violated the order.[8] *Id.* at 2804-05. The Supreme Court rejected this argument, holding that the plaintiff "did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband." *Id.* at 2810. Despite the seemingly mandatory language of the restraining

---

[8] The restraining order stated, "*A peace officer shall use every reasonable means to enforce a restraining order.*" *Town of Castle Rock*, 125 S. Ct. at 2804-05 (emphasis in original). The order also stated, *"A peace officer shall arrest, or, if an arrest would be impracticable under the circumstances, seek a warrant for the arrest of a restrained person,"* when there was probable cause to believe the order had been violated. *Id.*

order, the Court noted that the police department had discretion in determining whether to arrest the plaintiff's husband. *Id.* at 2806. Accordingly, the Court concluded that the plaintiff did not have a "legitimate claim of entitlement" to the enforcement of the order. *Id.* at 2803 ("[A] benefit is not a protected entitlement if government officials may grant it or deny it at their discretion."). Similarly, any seemingly mandatory language in the *Jerry M.* Consent Decree would not, by itself, indicate that Mr. Nelson had a constitutionally-protected property interest in its enforcement.

The ambiguity of the alleged "entitlement" claimed by Ms. Turner on behalf of her son also counsels against extending due process protections. She makes only generalized allegations of wrongdoing, stating that the District failed: (1) to "adequately supervise" the YSA group homes and Mr. Hill; (2) to return Mr. Hill back to custody within sixty days;[9] and (3) to assign sufficient officers to locate runaway juveniles. Compl. ¶ 38. "Such indeterminacy is not the hallmark of a duty that is mandatory. Nor can someone be safely deemed 'entitled' to something when the identity of the alleged entitlement is vague." *Town of Castle Rock*, 125 S. Ct. at 2807.

Finally, the Court agrees with the District of Columbia that whatever "benefit" might inure to public safety from the *Jerry M.* Consent Decree, that benefit serves the public at large and not Mr. Nelson individually. *See* Defs.' Mem. at 9. The underlying purpose of *Jerry M.* was to protect the rights of the juvenile offenders to whom it applied, not to protect the public from those individuals. As part of the District's juvenile criminal justice system, the Consent Decree serves public rather than private ends and does not grant a "legitimate entitlement" to individuals. *See Town of Castle Rock*, 125 S. Ct. at 2808.

---

[9] This argument is irrelevant to Ms. Turner's case inasmuch as Mr. Nelson was killed by Mr. Hill only three days after Mr. Hill ran away from the group home.

The Court concludes that Mr. Nelson had no property interest subject to due process protection under the Fifth Amendment. Count I will be dismissed.

### B. The Negligence Claims

In Counts II through IV, Ms. Turner's complaint alleges that the District of Columbia and Gayle Turner are liable to her and her deceased son for their negligence that allegedly led to his death. Defendants assert that all negligence claims are barred by the public duty doctrine. The Court agrees.

The District of Columbia Court of Appeals has repeatedly emphasized "the fundamental principle that a government and its agents are under no general duty to provide public services . . . to any particular individual citizen." *District of Columbia v. Forsman*, 580 A.2d 1314, 1317 (D.C. 1990) (quoting *Warren v. District of Columbia*, 444 A.2d 1, 4 (D.C. 1981) (*en banc*)). Accordingly,

> the District is subject to liability for injuries arising from the negligence of its employees *only if the duty owed to the plaintiff was a special duty to that person* as an individual or as a member of a class of persons to whom a special duty is owed; the District cannot be sued if the duty it owed was a general duty to the public at large.

*Auto World, Inc. v. District of Columbia*, 627 A.2d 11, 13 (D.C. 1993) (emphasis added) (quoting *Powell v. District of Columbia*, 602 A.2d 1123, 1127 (D.C. 1992)); *see also Miller v. District of Columbia*, 841 A.2d 1244, 1246 (D.C. 2004). The doctrine is designed "to protect municipalities against what would be an overwhelming tide of liability if local governments were liable for mishaps which occur during the provision of public services." *Joy v. Bell Helicopter Textron*, No. 88-2165, 1991 U.S. Dist. LEXIS 2193, at *7 (D.D.C. Feb. 26, 1991). If the public duty doctrine did not exist:

> then the city would be potentially liable for every oversight, omission,
> or blunder of its officials – a blunder which potentially could so deplete
> the resources necessary to provide police protection, fire protection,
> and ambulance service as to result in the elimination of those services
> altogether.

*Id.* at * 7 (quoting *Wanzer v. District of Columbia*, 580 A.2d 127, 132 (D.C. 1990)).

The reach of the public duty doctrine as applied by the District of Columbia courts is illustrated in *Klahr v. District of Columbia*, 576 A.2d 718 (D.C. 1990). *Klahr* was a civil suit that followed a double homicide by a recent escapee from a halfway house operated by the D.C. Department of Corrections. The plaintiffs asserted that the District owed the murdered couple a duty of care to confine and supervise the murderer and to prevent his escape. The case was dismissed because the District and its employees "owed the [decedents] no greater duty than, or different from, that which it owed to the public at large." *Id*. at 719. Accordingly, the public duty doctrine barred the plaintiffs' claims.

> When a claim is made that the District negligently failed to protect someone
> from harm, the person advancing that claim must reckon at the outset with
> "the fundamental principle that a government and its agents are under no
> general duty to provide public services, such as police protection, to any
> particular individual citizen." In order to convert a general duty owed to the
> public into a special duty owed to an individual, a plaintiff must allege and
> prove two things: (1) a direct or continuing contact between the injured
> party and a governmental agency or official, and (2) a justifiable reliance on
> the part of the injured party.
>
> . . . "[W]e have allowed an exception to this rule only where a specific
> undertaking to protect a particular individual has occurred, and that
> individual has justifiably relied upon such an undertaking."

*Id.* (citations omitted).

Recognizing this precedent, Ms. Turner presents the Court with two alternative analyses by which her negligence claims could proceed.  First, she informs that Court that she "seeks to hold Defendants liable for the duties which were voluntarily agreed to and set forth in the Consent Decree in *Jerry M.*"  Pl.'s Opp., Ex. 1 at 15.  She claims that "Defendants actively assumed the care and control of juveniles with histories [of] deviant behavior and had a duty to provide adequate services to supervise said juveniles."  *Id.* at 16.  Her negligence claims "address[] the overall supervision of a group home which allowed James Davon Hill to escape custody."  *Id.* at 18.  She cites *District of Columbia v. Banks*, 646 A.2d 972, 979-80 (D.C. 1994), *Liser v. Smith*, 254 F. Supp. 2d 89 (D.C. 2003), and *White v. United States*, 780 F.3d 97 (D.C. Cir. 1986) in support of this argument.

As is clear from the description of her claims, Ms. Turner describes no "special relationship" between her or her son and the District of Columbia that might overcome the public duty doctrine.  *See Taylor v. District of Columbia*, 776 A.2d 1208, 1214-15 (D.C. 2001) ("The required contact must . . . be a direct transaction with the party injured or an arms-length relationship in which the city's agent is dealing directly, in some form, with the person injured.  Moreover, the government must engage in an affirmative undertaking of protection on which the victim justifiably relies.") (internal quotations and citations omitted).  Ms. Turner wants to enforce a Consent Decree to which neither she nor her son was a party.  The cases on which she relies sound vaguely similar to this lawsuit but are readily distinguishable.

In *District of Columbia v. Banks*, the D.C. Court of Appeals held that where a statute specifically waives certain sovereign immunity protections, the public duty doctrine is also waived.  *See* 646 A.2d at 979-80.  *Banks* concerned a motorist who was injured as a result of a police chase.

The legal standards for conducting a police chase, or, an "emergency run," are codified at D.C. Code § 2-412.  Because the "emergency run statute" waived sovereign immunity, the public duty doctrine was not applicable.  *Banks*, 646 A.2d at 979-80.  Ms. Turner asserts that the Consent Decree constitutes an analogous waiver by the District.  However, there is nothing in the Consent Decree that indicates that the public has a right to enforce it or that the District has waived its sovereign immunity for crimes committed by absconding juveniles.

Ms. Turner's reliance on *Liser v. Smith* and *White v. United States* is similarly unhelpful.  *Liser* concerned a police shooting which directly injured the plaintiff.  *See* 254 F. Supp. 2d at 102.  There was no question of third-party violence.  "The claim that the government has no general duty to protect particular citizens from injury is simply a non-sequitor where the government itself is solely responsible for that injury, which it has caused by the allegedly negligent use of its own police powers."  *Id.*  In *White v. United States*, the federal government was held liable for the actions of a criminally insane escapee from St. Elizabeth's Hospital.  Noting that D.C. Code § 24-301(e) (now repealed) set forth a presumption of dangerousness for the criminally insane, and that such a person confined in a hospital could not be released without court order, the D.C. Circuit held that the federal government had a duty to confine the individual and had no discretion to allow him to wander the grounds of St. Elizabeth's Hospital, from which he had escaped.  *White,* 780 F.2d at 103.

Each of these cases touches on an aspect of this case, but with only the weight of a feather.  Yes, the District can waive its sovereign immunity by adopting a statute, but the Consent Decree settled a class-action lawsuit between *specific* parties and gave no enforcement rights to the public at large.  Yes, the District may be liable for the negligent actions of its police officers when

they directly shoot a citizen, but in this case, Ms. Turner is alleging that the District failed to prevent a *third party* from shooting her son.  Yes, the District might be liable if it had a non-discretionary duty to confine an individual who escaped and killed someone, but the Consent Decree did not establish a "presumption of dangerousness" for juveniles in group homes or confer a non-discretionary duty on the District to confine them.[10]  In fact, the purpose of the Consent Decree was entirely to the contrary: to set up group homes so that juveniles could be released from confinement in a secure location.  Ms. Turner's efforts to enforce the Consent Decree are unavailing.

        The second analytical basis offered by Ms. Turner for her suit invites the court to ignore local law:

> The public duty doctrine no longer serves the purpose for which it was conceived.  The public duty doctrine was devised for a number or rationales including [] avoiding judicial second-guessing of legislative and administrative decisions about allocating limited public resources; avoiding a potential drain on public funds that could result if all government employee mistakes rendered D.C. potentially liable; avoiding exposure of government employees to unreasonable risks of litigation; and preserving government employees['] discretion.
>
> There is a growing trend among states to disregard the tedious rule of general duty/special duty in favor of general common law principals of duty.  Specifically, Alaska, Colorado, Florida, Louisiana, Nebraska, Oregon and Wisconsin have abrogated the doctrine in favor of statutory enactments or general theories of negligence.
>
> . . .
>
> The public duty doctrine is no longer necessary to shield Governments from liability where sovereign immunity, discretionary immunity and tort liability

---

[10]   The District notes that the D.C. Court of Appeals has not indicated whether it agrees with the reasoning of *White v. United States*.  In *Klahr v. District of Columbia*, the court noted that the *White* decision is not binding on the D.C. Court of Appeals and distinguished the case because the presumption of dangerousness could not apply to a criminal who had escaped detention.  *See* 576 A.2d at 721.

> statutes work to accomplish the same goals.  As evidence, at least nine
> states have abrogated the public duty doctrine without the influx of
> litigation and costly results which currently justify the doctrine.

Pl.'s Opp., at Ex.1 at 18-19 (citations omitted).  The Court must decline this invitation.  Should

counsel be convinced of his position, it should be presented to the local District of Columbia courts

or to the D.C. City Council.  As a federal court adjudicating common law claims, the Court is bound

to apply local law.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938).  The D.C. Court of

Appeals has spoken frequently and clearly on the point.  Changing mores in other parts of the

country are irrelevant.  The public duty doctrine bars all negligence claims against the District of

Columbia and Gayle Turner on these facts.

Given its disposition of the negligence claims, the Court does not address the notice

requirements of D.C. Code § 12-309 or whether Gayle Turner enjoyed qualified immunity.

## IV. CONCLUSION

The constitutional claims advanced on behalf of Mr. Nelson are without merit and

will be dismissed.  Ms. Turner's remaining claims, which sound in negligence, are barred by the

public duty doctrine.  Accordingly, they will also be dismissed.  All pending motions will be denied

as moot.  A separate order accompanies this memorandum opinion.


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: March 7, 2006.